UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| MARLO CLEVELAND, | ) | Case No. 09-CV-208-WQH (JMA) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | ) | |
| MICHAEL J. ASTRUE, Commissioner of Social Security Administration, | ) | |
| Defendant. | ) | |

Plaintiff Marlo Cleveland ("Plaintiff") seeks judicial review of Social Security Commissioner Michael J. Astrue's determination she is not entitled to supplemental security income ("SSI") benefits.  Plaintiff has filed a Motion for Summary Judgment to which Defendant has filed an Opposition brief as well as a Cross-Motion for Summary Judgment.  (Doc. No. 11, 14 & 15.)  For the reasons set forth below, the Court recommends Plaintiff's Motion for Summary Judgment be DENIED and Defendant's Cross-Motion for Summary Judgment be GRANTED.

## I.  PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income benefits on or around May 24, 2006.  (Admin. R. at 10.)  Her disability onset date was initially alleged to be January 1, 1993, although she later requested it be amended to the protective filing date.  (Id. at 27, 193.)  Plaintiff's claim was denied at the initial level and upon

1  reconsideration.  (Id. at 10)  Plaintiff then requested a hearing before an administrative

2  law judge ("ALJ"), which was held on October 16, 2007 before ALJ Eve B. Godfrey.  (Id.

3  at 10 - 22, 23 - 58.)  The ALJ determined Plaintiff was not disabled.  (Id. at 10 - 20.)

4  The Appeals Council for the Social Security Administration declined further review.  (Id.

5  at 1 - 3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

6                                    **II.  FACTUAL BACKGROUND**

7          Plaintiff was born on August 27, 1969 and was 38 years old at the time of the

8  administrative hearings.  (Id. at 27, 100.)  She has a tenth grade level education.  (Id.)

9  Her work history is minimal.  She once held a part-time seasonal job in phone sales in

10  1993 and 1994 and in 2000 she worked for about a one week period stocking shelves.

11  (Id. at 28 - 29.)

12          Plaintiff alleges that she is disabled due to mental impairment.[1]  She hears voices

13  in her head and is easily agitated by other people.  (Id. at 30, 32.)  She has difficulty

14  sleeping and concentrating on routine tasks.  (Id. at 32, 35.)

15                                    **III.  MEDICAL EVIDENCE**

16  **A.    Luisa B. Fijman – Examining Psychiatrist (2006)**

17          At Defendant's request, Plaintiff was examined by Board certified psychiatrist

18  Luisa B. Fijman, M.D. on or about June 29, 2006.  (Id. at 198-203.)  Medical records

19  were not reviewed.  (Id. at 198.)  Plaintiff's chief complaint was "anxiety and voices."

20  (Id.)  Plaintiff reported she had never been seen by a psychiatrist or admitted to a

21  psychiatric unit but was currently being seen by County Mental Health.  (Id. at 199.)

22  She informed Dr. Fijman she was taking Seroquel but did not remember the dose or the

23  name of the person that prescribed it for her.  (Id.)  Dr. Fijman reported Plaintiff

24  appeared to be "very evasive and vague" when questioned as to the names of the

25  professionals she was seeing.  (Id.)  She opined Plaintiff was less than truthful with the

26  _____

27          [1] In her application for benefits Plaintiff stated she was limited in her ability to work due
    to schizophrenia, knee and back problems.  This case, however, challenges the ALJ's decision

28  only as it relates to her mental illness and so the Court limits its discussion to this issue.  (Id. at
    118.)

1   information she provided.  (Id. at 200.)  She reported Plaintiff seemed to be less than

2   truthful about her use of alcohol and drugs but admitted to long term use of LSD and

3   marijuana.  (Id.)  Dr. Fijman reported Plaintiff was hostile during the examination.  (Id.)

4   She reported Plaintiff displayed an attitude of entitlement and refused to answer many

5   of the questions posed to her.  (Id.)  Dr. Fijman diagnosed polysubstance abuse

6   disorder and malingering with some borderline and anti-social traits.  (Id. at 202.)  The

7   Global Assessment Function ("GAF") was scored at 70 to 75.[2]  (Id.)  She concluded

8   Plaintiff did not have a psychiatric condition that would interfere with her ability to work.

9   (Id. at 203.)  She further opined Plaintiff needed to maintain sobriety but expressed

10  skepticism that she would do so.  (Id.)

11  **B.    County Mental Health  – Treating Physicians (2006 – 2007)**

12         Plaintiff was first seen at MHS North Coastal Mental Health for a mental health

13  assessment on June 26, 2006.  She reported she was diagnosed with a psychotic

14  disorder at the age of 23.  (Id. at 241.)  She also reported becoming disoriented in large

15  crowds and seeing shadows and figures.  (Id. at 241-243.)  Plaintiff was seen by John

16  Donnelly, M.D. on July 12, 2006.  In the preceding two months she had lost 50 pounds

17  and reported having a poor appetite and fragmented sleep.  (Id. at 245.)  She also had

18  low energy and difficulty concentrating.  (Id.)  She was assessed as having Psychotic

19  Disorder, not otherwise specified; Depressive Disorder, not otherwise specified; and

20  Posttraumatic Stress Disorder.  (Id. at 247.)  She was prescribed Paxil and Abilify and

21  / /

22  / /

23  / /

24  / /

25

26         [2]  A GAF between 71 and 80 indicates "(i)f symptoms are present, they are transient
    and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family
27  argument); no more than slight impairment in social, occupational, or school functioning (e.g.,
    temporarily falling behind in schoolwork."  *Diagnostic and Statistical Manual of Mental*
28  *Disorders (DSM-IV)*, Multiaxial Assessment, rev. May 20, 2002.

1   was referred to a depression/anxiety group.  (Id. at 247.)  The GAF was scored at 50.[3]

2   (Id.)

3        Plaintiff was seen by J. Fernando Bayardo, M.D. on September 12, 2006 for

4   psychiatric reassessment and medication monitoring.  (Id. at 266-267.)  She reported

5   she had heard voices since childhood except when she took LSD in high school.  The

6   Abilify was irritating her skin so it was discontinued and Risperdal was prescribed.  (Id.)

7   The GAF was scored at 55.[4]  (Id.)

8        Dr. Bayardo saw Plaintiff again on October 9, 2006 for monitoring.  (Id. at 263-

9   264.)  She reported nightmares and getting angry but denied having anxiety or

10  depression.  (Id. at 264.)  On a scale of 0 - 10 with 0 being "No Symptoms, " 5 being

11  "Medium" and 10 being "Extreme," Dr. Bayardo rated the severity of her anxiety

12  symptoms at 8.  (Id. at 263.)  All other symptoms were rated at 5 or lower.  (Id.)  Her

13  dosage of Risperdal was increased by 1 mg with the hope it would help with the voices.

14  (Id. at 264.)

15       Plaintiff returned to County Mental Health on November 28, 2006 and was seen

16  again by Dr. Donnelly.  (Id. at 259-261.)  She reported she was feeling more relaxed

17  and less irritable on the new medication.  (Id. at 259.)  The severity of her anxiety

18  symptoms was rated at 2 and her irritability symptoms at 2-3.  (Id. at 260.)  All other

19  symptoms were rated at 0.  (Id.)  The GAF was scored at 45.  (Id. at 261.)  Dr.

20  Donnelly's progress notes from a visit on August 13, 2007 also indicate at that time

21  Plaintiff described her mood as "pretty good."  (Id. at 291.)  She was sleeping eight

22  hours a night and her concentration was "not real great, more scatter brained."  (Id.)

23

24       [3]  A GAF between 41 and 50 indicates "(s)erious symptoms (e.g., suicidal ideation,
    severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,
25  occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV, Multiaxial
    Assessment.
26

27       [4]  A GAF between 51 and 60 indicates "(m)oderate symptoms (e.g., flat affect and
    circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational,
28  or school functioning (e.g., few friends, conflicts with peers or co-workers)."
    DSM-IV, Multiaxial Assessment.

09cv208-WQH(JMA)

1   The only abnormality noted was non-command auditory hallucinations which she

2   reported as being "always there" but were not louder or more intense than usual.  (Id.)

3   The GAF was scored at 45.  (Id. at 292.)

4        Dr. Donnelly completed a Mental Impairment Questionnaire on August 20, 2007.

5   (Id. at 279-285.)   He reported that Plaintiff had been under his care since June 26,

6   2006 and had been seen once a month.  (Id. at 279.)  His clinical findings included

7   auditory hallucinations that never completely resolve, low energy, "not good"

8   concentration and a history of Posttraumatic Stress Disorder related to past abuse.  (Id.

9   at 279.)  The prognosis was "fair to poor."  (Id.)  Symptoms included decreased energy,

10   persistent anxiety, difficulty thinking or concentrating, recurrent intrusive recollections of

11   a traumatic experience, hallucinations, emotional lability and easy distractibility.  (Id. at

12   280.)  He opined Plaintiff would be unable to meet competitive standards in the

13   workplace, including maintaining attention for a two hour segment, maintaining regular

14   and punctual attendance, completing a normal workday and workweek without

15   interruptions from psychologically based symptoms, performing at a consistent pace

16   without an unreasonable number and length of rest periods, asking simple questions or

17   request assistance, responding appropriately to changes in a routine work setting, or

18   dealing with normal work stress.  (Id. at 281.)  He noted her diagnosis and related

19   symptoms impaired her ability to function socially or occupationally.  (Id. at 281-283.)

20   The GAF was scored at 45.  (Id. at 279.)

21        Plaintiff continued to be seen by Dr. Donnelly at regular intervals, including visits

22   on December 28, 2006 (Id. at 313-314), January 30, 2007 (Id. at 310-312), February 13,

23   2007 (Id. at 307-309), March 15, 2007 (Id. at 304-306), April 16, 2007 (Id. at 302-303),

24   May 1, 2007 (Id. at 300-301) and June 28, 2007 (Id. at 297-298).  During this time frame

25   she continued with Risperdal and Celexa prescriptions.  On December 28, 2006, the

26   severity of her depression symptoms were rated as being 0-2.  (Id. at 313.)  Anxiety and

27   psychosis positive were rated at 1 and all other symptoms were rated 0.  (Id.)  During

28   the January 30, 2007 visit, she was observed to be highly irritated, with a severity rating

1   of 9.  (Id. at 311.)  Manic, appetite, energy level, psychosis, agitation, and insomnia

2   symptoms were rated at 3 or lower and all other symptoms were rated at 0.  During the

3   other visits she described her mood and energy levels as "pretty good" (Id. at 303) and

4   her mood as "pretty good considering all the stress." (Id. at 298).  She also reported

5   she was coping better (Id. at 300).  She continued to hear voices during this time frame.

6   (Id. at 307.)  The severity of her irritability was rated as 4 on February 13, 2007, with all

7   other symptoms being 3 or lower.  (Id. at 308.)  On March 15, 2007 her irritability was

8   again rated at 4.  (Id. at 305.)  Her anxiety symptoms were rated at 0-5 and all other

9   symptoms were rated at 3 or lower.  (Id.)  The GAF was assessed during the evaluation

10  visits on January 30, 2007, February 13, 2007, and March 15, 2007 as 45.  (Id. 312, 309

11  and 306.)

12  **C.    Romualdo Rodriguez, M.D. - Examining Psychiatrist (2007)**

13          At Defendant's request, Plaintiff was examined by psychiatrist Romualdo

14  Rodriguez, M.D. on or about December 1, 2007.  (Id. at 317-327.)  In connection with

15  his evaluation, Dr. Rodriguez reviewed Dr. Fijman's evaluation and MHS North Coastal

16  Mental Health records.  (Id. at 317.)  Plaintiff identified her chief complaint as "I hear

17  voices and freak out a lot." (Id.)  Plaintiff also noted a variety of problems including the

18  inability to follow instructions or complete tasks, disorganization and difficulty with

19  concentration.  (Id. at 318.)  Dr. Rodriguez reported during the exam Plaintiff made good

20  eye contact and good interpersonal contact, and was generally cooperative.  (Id. at

21  320.)  He observed she appeared to be genuine and truthful and there was no evidence

22  of exaggeration or manipulation.  (Id.)  He found her thought process to be coherent and

23  organized and without tangentiality or loosening associations.  (Id.)  Dr. Rodriguez

24  diagnosed Plaintiff with polysubstance dependence in an unknown state of remission;

25  attention deficit/hyperactivity disorder; anxiety disorder, not otherwise specified;

26  psychotic disorder, not otherwise specified; and post-traumatic stress disorder.  (Id. at

27

28

322.)  He assessed a GAF of 65.[5]  (Id.)  He felt that with proper treatment for ADHD, total abstinence from drugs and alcohol and evaluation for any other psychiatric problems, Plaintiff could make significant progress in twelve months.  (Id.)  With regard to her functional assessment, he opined Plaintiff was:  able to understand, remember and carry out simple, one or two step job instructions; able to carry out detailed and complex instructions; and slightly limited in her ability to relate and interact with supervisors, coworkers and the public; moderately limited in her ability to maintain concentration, persistence, and pace; slightly limited in her ability to associate with day-to-day activities; slightly limited in her ability to adapt to stresses common to a normal work environment; slightly limited in her ability to maintain regular attendance in the work place and perform activities on a consistent basis; and slightly limited in her ability to perform work activities without special or additional supervision.  (Id. at 323.)

## IV.  THE ADMINISTRATIVE HEARING

The ALJ conducted an administrative hearing on October 16, 2007.  Plaintiff was represented by counsel and testified at the hearing.  Testimony was also offered by medical expert witness Dr. Goldberg, M.D.[6] and vocational expert Ms. Jasco.

**A.   Plaintiff's Testimony**

Plaintiff testified she lives with her five year old son and relies on her grown children, neighbors and friends to help her take care of him.  (Id. at 27, 34, 36 - 37.) She admitted to engaging in some drug use in the past, but testified she was not

/ /

---

[5]  A GAF between 61 and 70 indicates "(s)ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV, Multiaxial Assessment.

[6]  In his written decision, the ALJ misidentifies the testifying medical expert as Sidney Bolter, M.D.  (Id. at 17.)  Defendant's briefing also refers to the medical expert as Dr. Bolter. Memorandum of Point and Authorities in Support of Defendant's Cross-Motion for Summary Judgment, p. 4.  In fact, Dr. Bolton did not testify at the hearing and the sole testifying medical expert was Dr. Goldberg.  This mistake by the ALJ and defense counsel appears to be limited to the name of the medical expert as all testimony attributed to Dr. Bolter was in fact given by Dr. Goldberg.  (Admin. R. at 17-18 and 43-54.)

currently using illicit drugs and had been a member of AA for about 15 years.  (Id. at 37-38.)

She testified she finds it difficult to be around "a lot of people" because she hears voices in her head and it is difficult for her to distinguish whether the voices are coming from others or whether they are in her head.  (Id. at 30 - 32.)  The voices tell her to do "bad things" like hit people.  (Id. at 31.)  Medication has not helped her with the voices.  (Id.)  When asked whether she had applied for food stamps, Plaintiff testified she had not because it is difficult for her to be in crowded rooms.  (Id. at 30.)  She remarked it was difficult for her to attend the hearing because of the "computers clicking all around" her.  (Id.)

She said she is easily agitated by others and does not speak to her father as a result.  (Id. at 32.)  She also has difficulty sleeping, sometimes not sleeping or leaving her room for weeks.  (Id. at 32-33.)  Sometimes the voices she hears keep her awake and when she is able to sleep, she has nightmares or dreams about past events.  (Id. at 33-34.)  She also testified she has difficulty focusing and concentrating on routine tasks such as laundry.  (Id. at 35.)

**B.  Medical Expert Testimony**

Dr. Goldberg testified Plaintiff did not meet a listing.  (Id. at 43.)  He further opined the low GAF scores assigned by Dr. Donnelly were not supported by his observation notes.  (Id. at 46, 50.)  For example, Dr. Goldberg testified the notes revealed that many times Plaintiff looks "actually pretty good" to Dr. Donnelly "and yet he comes up with a GAF45."  (Id. at 45.)  He further observed the severity of her symptoms was generally very low and under 5.  (Id. at 46.)  He was also critical of the lack of a solid initial mental evaluation.  (Id. at 47.)  Dr. Goldberg opined Plaintiff had moderate limitations in her daily activities and social functioning and mild limitations on her ability to concentrate.  (Id.)  He further opined she would be restricted to non-public work with minimal contact with other people, requiring simple concentration and mild to simple committed tasks.  (Id. at 48.)

**C.     Vocational Expert Testimony**

Ms. Jasco testified as a vocational expert.  (Id. at 55-57.)  She opined an individual of Plaintiff's age, education and work experience who is capable of doing simple repetitive tasks in a non-public environment would be suitably employed in several occupations including as a garment folder, a seamer or a bench hand.  (Id. 55-56.)  She further testified there are approximately 1100 garment fold jobs, 1700 seam steamer jobs, and 1780 bench hand jobs in the regional economy.  (Id. at 55.)  There are approximately 1.2 million garment folder jobs, 1.4 seam steamer jobs, and 1.42 million bench hand jobs in the national economy.  (Id.)

## V.  THE ALJ's DECISION

After considering the record, the ALJ made the following findings:

1.     The claimant has not engaged in substantial gainful activity since May 24, 2006, the application date [citation omitted].

2.     The claimant has the following severe impairment: depression, not otherwise specified with intermittent, non-command hallucinations [citation omitted].

3.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 [citation omitted].

4.     ...(T)he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: simple repetitive tasks in a non-public work environment with little contact with others.

5.     The claimant has no past relevant work [citation omitted].

6.     The claimant was born on August 22, 1969 and was 36 years old, which is defined as a younger individual age 18-49, on the date the application was filed [citation omitted].

7.     The claimant has a limited education and is able to communicate in English [citation omitted].

8.     Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled [citation omitted].

9.     Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exists in significant numbers in the national economy that the claimant can perform [citation omitted]

10.   The claimant was not under a disability, as defined in the Social Security Act, since May 24, 2006, the date the application was filed [citation omitted].

(Id. at 12-20.)

## VI.  STANDARD OF REVIEW

To qualify for disability benefits under the Social Security Act, an applicant must show:  (1) he or she suffers from a medically determinable impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of twelve months or more, and (2) the impairment renders the applicant incapable of performing the work he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. § 423(d)(1)(A), (2)(A) (West 2004).  An applicant must meet both requirements to be "disabled."  Id.  Further, the applicant bears the burden of proving that he or she was either permanently disabled or subject to a condition which became so severe as to disable the applicant prior to the date upon which his or her disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

## A.  Sequential Evaluation of Impairments

The Social Security Regulations outline a five-step process to determine whether an applicant is "disabled."  If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520).  Although the ALJ must assist the applicant in developing a record, the applicant bears the burden of proof as to the first four steps.  Id.  If the fifth step is reached, the burden shifts to the Commissioner.  Id.

The evaluation process is as follows:

Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two.

Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "<u>not</u> <u>disabled</u>" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two, and the evaluation proceeds to step three.

Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three, and the evaluation proceeds to step four.

Step 4.  Is the claimant able to do any work that he or she has done in the past?  If so, then the claimant is "<u>not</u> <u>disabled</u>" and is therefore not entitled to disability insurance benefits.  If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four, and the evaluation proceeds to the fifth and final step.

Step 5.  Is the claimant able to do any other work?  If not, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits.  If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do.  There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert, or (2) by reference to the Medical-Vocational Guidelines . . . .  If the Commissioner meets this burden, the claimant is "<u>not</u> <u>disabled</u>" and therefore not entitled to disability insurance benefits.  If the Commissioner cannot meet this burden, then the claimant is "<u>disabled</u>" and therefore entitled to disability insurance benefits.

<u>Tackett</u>, 180 F.3d at 1098-99 (footnotes and citations omitted).

**B.    Judicial Review**

Sections 205(g) and 1631(c)(3) of the Social Security Act allow unsuccessful applicants to seek judicial review of the Commissioner's final agency decision.  42 U.S.C.A. §§ 405(g), 1383(c)(3).  The scope of judicial review is limited.  The Commissioner's final decision should not be disturbed unless:  (1) the ALJ's findings of fact are not supported by substantial evidence or (2) the ALJ failed to apply the proper legal standards.  <u>See</u> <u>Flaten v. Sec'y of Health & Human Servs.</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

The term "substantial evidence" refers to evidence that a reasonable person might accept as adequate to support the ALJ's conclusion, considering the record as a whole.  <u>See</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Thomas v. Barnhart</u>, 278

1   F.3d 947, 954 (9th Cir. 2002).  Substantial evidence means "more than a scintilla but

2   less than a preponderance" of the evidence.  Jamerson v. Chater, 112 F.3d 1064, 1066

3   (9th Cir. 1997).  The Court must consider the record as a whole, weighing both the

4   evidence that supports and detracts from the Commissioner's conclusions.  See Mayes

5   v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001); Desrosiers v. Sec'y of Health & Human

6   Servs., 846 F.2d 573, 576 (9th Cir. 1988).  Even if the ALJ's findings are supported by

7   substantial evidence, they must be set aside if the ALJ failed to apply the proper legal

8   standards in weighing the evidence and reaching his or her decision.  See Benitez v.

9   Califano, 573 F.2d 653, 655 (9th Cir. 1978).

10      Section 405(g) permits this Court to enter a judgment affirming, modifying, or

11  reversing the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be

12  remanded to the Social Security Administration for further proceedings.  Id.

### VII.  DISCUSSION

14      Plaintiff contends the ALJ's decision to deny her SSI benefits was legally

15  improper and was not supported by substantial evidence.  Plaintiff's motion is

16  predicated on one argument - the ALJ failed to give controlling weight to the opinion of

17  Dr. Donnelly, her treating physician.

18      Ninth Circuit case law distinguishes among the opinions of three types of

19  physicians: "(1) those who treat the claimant (treating physicians); (2) those who

20  examine but do not treat the claimant (examining physicians); and (3) those who neither

21  examine nor treat the claimant (nonexamining physicians)."  Lester v. Chater, 81 F.3d

22  821, 830 (9th Cir. 1996).  Generally, more weight is accorded to the treating physician's

23  opinion.  Id.  However, a treating physician's opinion is not necessarily conclusive as to

24  either physical condition or the ultimate issue of disability.  Magallanes v. Bowen, 881

25  F.2d 747, 751 (9th Cir. 1989).  The ALJ may disregard the treating physician's opinion

26  whether or not that opinion is contradicted.  Id.  When a non-treating physician's

27  opinion contradicts that of the treating physician, but is not based on independent

28  clinical findings, or rests on clinical findings also considered by the treating physician,

12

1   the opinion of the treating physician may be rejected only if the ALJ gives "specific and

2   legitimate reasons for doing so that are based on substantial evidence in the record."

3   Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  The opinion of a nonexamining

4   medical advisor cannot by itself constitute substantial evidence that justifies the

5   rejection of the opinion of an examining or treating physician.  Morgan v. Commissioner,

6   169 F.3d 595, 602 (9th Cir. 1999).  "The ALJ can meet this burden by setting out a

7   detailed thorough summary of the facts and conflicting clinical evidence, stating his

8   interpretation thereof, and making findings."  Cotton v. Bowen 799 F.2d 1403, 1408 (9th

9   Cir. 1986).

10      In discussing Dr. Donnelly's opinion, the ALJ stated she had "given it less

11   weight... than it may otherwise merit."  (Admin. R. at 17.)  The ALJ explained her

12   decision was  "due to inconsistencies in the record (citation omitted)."  (Id. at 16.)

13   Instead, she adopted the opinion evidence of Dr. Goldberg, whose opinions she found

14   to be based on clinical findings and consistent with the record as a whole.  (Id. at 19.)

15      **A.      The ALJ's first example of an inconsistency in the record is not a**
16              **legitimate reason to reject Dr. Donnelly's opinion**

17      The first of the identified inconsistencies is the ALJ's observation the August 20,

18   2007 Mental Impairment Questionnaire was not actually completed by Dr. Donnelly, but

19   rather by a MHS North Coastal Mental Health case manager.  (Id.)  The ALJ's evidence

20   in support of this assertion is the MHS North Coastal Mental Health progress notes

21   dated August 22, 2007.  (Id. at 289.)  Plaintiff argues this is not a legitimate reason to

22   reject Dr. Donnelly's opinion.  The Court concurs.  Although, as the ALJ notes, the

23   progress notes indicate the document in question was prepared by an employee of Dr.

24   Donnelly's clinic, they also indicate Dr. Donnelly then "reviewed and signed" the form.

25   (Id. at 289.)  In fact, the questionnaire bears Dr. Donnelly's signature, which in and of

26   itself, sufficiently evidences he endorsed the opinions contained therein.  (Id. at 284.)

27   Although the Court accepts Dr. Donnelly's signature as evidence he reviewed and

28   approved the contents of the questionnaire, the Court also observes the doctor may

have been a more active participant in its preparation than the progress notes indicate or for which the ALJ gave him credit.  The questionnaire bears his initials ("J.D.") in numerous locations where responses were initially made and then modified.  (Id. at 281 - 282.)  The handwritten portions of it are were also clearly written by two different people, with the second set of handwritten notes elaborating or explaining the earlier comment.  (Id. at 279, 281-283.)  As stated earlier, however, the question as to how much of a role Dr. Donnelly took in the preparation of the Questionnaire is irrelevant.  At a minimum, he reviewed and endorsed the report, as stated in the progress notes and as evidenced by his signature.  Thus, the ALJ's explanation that Dr. Donnelly did not actually prepare the Questionnaire is not a legitimate basis to reject his opinions.

**B.    The ALJ's second example of an inconsistency in the record is a specific and legitimate reason based on substantial evidence in the record.**

The ALJ's second, and only other, example of an inconsistency in Dr. Donnelly's records relates to an internal inconsistency between his progress notes and his assessment of Plaintiff's functional limitations.  Because the Court has already found the ALJ's other stated inconsistency in the record is not a legitimate basis for rejecting Dr. Donnelly's opinion, the question as to whether the ALJ's rejection of Dr. Donnelly's opinion was proper must be evaluated on this stated reason alone.

An internal conflict between treatment notes and a treating physician's opinion can be justification for a decision not to give the treating physician's opinion controlling weight if supported by substantial evidence in the record.  Halonan v. Massanari, 246 F.3d 1195, 1205; See also 20 C.F.R. §§ 404.1527(c)(2), (d)(2), (d)(4).  In this case, the ALJ specifically commented that on August 13, 2007, Dr. Donnelly observed Plaintiff to be

> alert, calm and cooperative with direct eye contact and oriented in all spheres. She displayed no unusual or bizarre behavior; and her speech was relevant, coherent and organized with regular rate and rhythm and normoproductive.  Her mood was described as "pretty good," her affect was broad, and there were no visual hallucinations, no suicidal ideations, no homicidal ideation, and no paranoia.  (Admin. R. at 16.)

14

1    The ALJ stated the only abnormality noted at that time was "some" auditory

2    hallucinations that "were non-command and [Plaintiff] reported that they were not

3    bothersome." (Id.)  The ALJ noted, however, despite his patient's seemingly

4    unremarkable status, Dr. Donnelly assigned Plaintiff a GAF of 45, "suggesting serious

5    symptoms or impairment." (Id.)

6         The record demonstrates other instances of this type of inconsistency between

7    Dr. Donnelly's observations and his assessment of her GAF.  For example, on

8    November 28, 2006, Plaintiff reported she was feeling more relaxed and less irritable on

9    the new medication. (Id. at 259.)  Dr. Donnelly rated the severity of her symptoms as

10   very low. (Id. at 260.)   Her anxiety symptoms were rated at 2 (with 0 representing "No

11   Symptoms" and 5 being "Medium") and her irritability symptoms at 2-3. (Id.)  All other

12   symptoms were rated at 0, but the GAF was scored at 45, which indicates serious

13   symptoms or impairments. (Id. at 261.)  On February 13, 2007, Dr. Donnelly rated the

14   severity of Plaintiff's irritability symptoms as 4, with all other symptoms being 3 or lower,

15   but her GAF was scored at 45. (Id. at 308-309.)  On March 15, 2007, her irritability was

16   again rated at 4. (Id. at 305.)  Her anxiety symptoms were rated at 0-5 and all other

17   symptoms were rated at 3 or lower, but her GAF was again assessed at 45. (Id. at 305-

18   306.)

19        Dr. Goldberg's testimony was also critical of the inconsistency between Dr.

20   Donnelly's notes and his opinions, as observed by the ALJ. (Id. at 17.)  The ALJ

21   specifically noted Dr. Goldberg testified the progress notes from the August 13, 2007

22   visit were inconsistent with the GAF score and functional limitations Dr. Donnelly

23   assigned during that evaluation. (Id. at 17, 45-47.)  She also commented on Dr.

24   Goldberg's testimony regarding the inconsistency between Dr. Donnelly's symptom

25   severity ratings and the GAF scores at other evaluations. (Id.)

26        Dr. Goldberg opined, based on his thorough review of the medical records and

27   Plaintiff's testimony, that her severe impairment was a depressive disorder, not

28   otherwise specified, with intermittent non-command hallucinations, and that it did not

1  meet or equal any impairment.  (Id. at 17-18.)  He stated Plaintiff's symptoms were not

2  so severe that she met a listing.  (Id. at 17.)

3       Dr. Goldberg's assessment is consistent with Dr. Donnelly's progress notes

4  (other than the GAF scores), as well as the medical record as a whole.  As the ALJ

5  observed, Plaintiff was examined by two psychiatrists, Dr. Fijman and Dr. Rodriguez,

6  who also opined Plaintiff's symptoms were not so severe they would interfere with her

7  ability to work.  (Id. at 14.)  Dr. Fijman reported Plaintiff displayed an entitled and

8  demanding attitude and refused to answer questions and comply with instructions

9  pertinent to the exam.  (Id. at 14 and 18.)   Dr. Fijman described her mood as irritable

10  and her affect as dysophoric, and opined Plaintiff was less than truthful about her

11  symptoms.  (Id.)  She diagnosed Plaintiff with polysubstance abuse disorder and

12  malingering with some borderline and anti-social traits.  (Id. at 14)  The GAF was scored

13  at 70 to 75, which the ALJ commented "suggests transient symptoms with no more than

14  slight impairment."  (Id.)  She concluded Plaintiff did not have a psychiatric condition

15  that would interfere with her ability to work.  (Id.)

16       During her exam by Dr. Rodriguez, Plaintiff made good eye contact, good

17  interpersonal contact, and was generally cooperative.  (Id. at 17.)  Her thought process

18  was coherent and organized and without tangentiality or loosening associations.  (Id.)

19  Dr. Rodriguez diagnosed Plaintiff with polysubstance dependence in an unknown state

20  of remission; attention deficit/hyperactivity disorder; anxiety disorder, not otherwise

21  specified; psychotic disorder, not otherwise specified; and post-traumatic stress

22  disorder.  (Id.)  He assessed a GAF of 65.  (Id.)  With regard to her functional

23  assessment, he opined Plaintiff was:  able to understand, remember and carry out

24  simple, one or two step job instructions; able to carry out detailed and complex

25  instructions; slightly limited in her ability to relate and interact with supervisors,

26  coworkers and the public; moderately limited in her ability to maintain concentration,

27  persistence, and pace; slightly limited in her ability to associate with day-to-day

28  activities; slightly limited in her ability to adapt to stresses common to a normal work

environment; slightly limited in her ability to maintain regular attendance in the work place and perform activities on a consistent basis; and slightly limited in her ability to perform work activities without special or additional supervision.  (Id.)

An ALJ may properly resolve conflicts and ambiguities in the medical evidence, as she did here.  See, e.g., Andrews, 53 F.3d 1035, 1039.  In this case, as explained above, the ALJ articulated specific and legitimate reasons based on substantial evidence in the record for rejecting Dr. Donnelly's opinions and adopting the opinions of Dr. Goldberg instead.  She set out a detailed thorough summary of the facts and conflicting clinical evidence, stated her interpretation thereof, and made findings, as required.  The Court further finds the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence, including the treating notes of Dr. Donnelly, two examining psychiatrists (Dr. Fijman and Dr. Rodriguez), and a non-examining medical adviser (Dr. Goldberg).  Lester, 81 F.3d at 831; Magallanes, 881 F.2d at 751-52.  For the aforementioned reasons, the Court finds the ALJ did not err by giving reduced weight to Dr. Donnelly's opinions regarding Plaintiff's work limitations and in finding Plaintiff is not disabled.

## VIII.  CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment should be **DENIED** and Defendant's Cross-Motion for Summary Judgment should be **GRANTED**.

This report and recommendation will be submitted to the Honorable William Q. Hayes, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Any party may file written objections with the Court and serve a copy on all parties on or before **August 9, 2010**.  The document should be captioned "Objections to Report and Recommendation."  Any reply to the Objections shall be served and filed on or before **August 20, 2010**.  The parties are advised that failure to

/ /

/ /

17

file objections within the specified time may waive the right to appeal the district court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  July 23, 2010

Jan M. Adler
U.S. Magistrate Judge